[85,89]

**NOT FOR  PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| RIGGS DISTLER & COMPANY, INC., | : | |
| Plaintiff, | : | Civil Action No. 03-5854 (FLW) |
| | : | |
| | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| VALERO REFINING COMPANY – NEW | : | |
| JERSEY and HOWE-BAKER | : | |
| ENGINEERS, LTD., | : | |
| Defendants | : | |
| | : | |
| v. | : | |
| | : | |
| C.H. SCHWERTNER & SON, INC., | : | |
| ET AL, | : | |
| Third Party Defendants | : | |
| | : | |

**WOLFSON, District Judge**

Presently before the Court are competing motions for Partial Summary Judgment filed by

Plaintiff/Third Party Defendants, as well as the Defendants, on the proper calculation of a

Construction Lien Fund, the maximum lien liability of a property owner against whom a lien has

been filed, pursuant to New Jersey's Construction Lien Law ("CLL").  The instant matter arises

out of a chain of construction agreements between property owner Valero Refining Company –

New Jersey ("Valero"), general contractor Howe-Baker Engineers, Ltd. ("Howe-Baker"),

1

subcontractor Jones LG, LLC  ("Jones"), and eight sub-subcontractors ("Lien Claimants")[1].  This dispute concerns the funds available to satisfy Plaintiff/Third Party Defendants' lien claims for work performed prior to Jones' bankruptcy and for which these parties have not been fully compensated.  Lien Claimants seek a determination that the amount of the lien fund is not less than $9,796,424.79 based on the prime contract between Valero and Howe-Baker and the value of the sub-subcontracts between Jones and Lien Claimants.   Defendants, Valero and Howe-Baker, move for Partial Summary Judgment contending that the amount of the lien fund is, at a maximum, $1,769,291.26 based on the smallest amount unpaid among all the contracts in the construction chain, including the contract between Howe-Baker and Jones.

The Court has considered the moving, opposition and reply papers, and for the reasons set forth below, Lien Claimants' Motion for Partial Summary Judgment will be DENIED and Defendants' Motion for Partial Summary Judgment will be DENIED.

## I. BACKGROUND

On November 26, 2002, Valero, the owner of a refinery in Paulsboro, New Jersey, entered into a contract with Howe-Baker to engineer, procure, fabricate and construct a continuous catalyst regeneration unit ("CCR Unit") at the Valero refinery pursuant to an Engineering, Procurement and Construction Agreement ("EPC Agreement").   Defendants'

---

[1] Plaintiff in this action is Riggs Distler & Company ("Riggs"); Third Party Defendants are: Brennan Industrial Contractors, Inc. ("Brennan"), C.H. Schwertner & Son, Inc. ("Schwertner"), I&S Inc. ("I&S"), Mid-Atlantic Constructors, Inc.("Mid-Atlantic"), Merrell & Garaguso, Inc. ("Merrell"), Schoonover Electric Company, Inc. ("Schoonover"), and SM Electric Company, Inc. ("SM"). However, where appropriate, the Court will refer to the individual sub-subcontractors collectively  as "Lien Claimants."

Statement of Facts ("SOF") at ¶ 1-2; Lien Claimants' Response to Defendant's SOF ("Resp. to Def's SOF") at ¶ 1-2.   The original price of the EPC Agreement was $110,147,980; however, the contract price eventually rose to $114,666,000 because of various change orders.   Id. at ¶ 4; id. at ¶ 4.  Under the EPC Agreement, Valero paid Howe-Baker according to a "milestone" payment schedule that required progress payments based on construction milestones enumerated in the Agreement.  Id. at ¶ 5; id. at ¶ 5.   Each progress payment was to consist of 90% of the amount due to Howe-Baker with Valero reserving the remaining 10% of each payment as retainage to be paid to Howe-Baker upon completion.  Def's App. Ex. 31 at § 7-8.

On January 8, 2003, Howe-Baker entered into an agreement with Jones ("HB/Jones Subcontract") to be the principal subcontractor for a large portion of the construction services required for the project. Def's SOF at ¶ 10; Lien Claimants' Resp. to Def's SOF at ¶ 10; Def's App., Ex. 32.  The amount of the HB/Jones Subcontract was $41,425,192. Def's App., Ex. 32 ¶ 2.1.   The terms of the subcontract required Howe-Baker to make payments to Jones based on itemized invoices for the portion of work completed at the time of the invoice's submission.  Id. at. ¶ 3.1.

Between February 2003 and September 2003, Jones entered into agreements with Lien Claimants and others to perform the construction services under the HB/Jones Subcontract. Defendants' SOF at ¶ 17-18; Lien Claimants' Resp. to Def's SOF at ¶ 17-18.  On September 30, 2003, however, Jones filed for bankruptcy.  Id. at ¶ 19; id. at ¶ 19.  Thereafter, on October 2, 2003,  Marino, one of Jones' subcontractors but not one of the Lien Claimants, filed a construction lien for $1,608,109.90. Id. at. ¶ 20; id. at ¶ 20.  Several days later, but prior to October 9, 2003, Amquip, another non- Lien Claimant subcontractor notified Howe-Baker of its

intent to file a construction lien claim for $484,278.24.  Id. at. ¶ 21; id. at ¶ 21.  However, Amquip never filed this lien claim.  Def's SOF at ¶ 34; Lien Claimant's Resp. to Def's SOF at ¶ 21.

As a result of Jones' bankruptcy, Howe-Baker and Jones negotiated a termination of the HB/Jones Subcontract ("Termination Agreement") for convenience on October 9, 2003.  Def's SOF at ¶ 22-23; Lien Claimants' Resp. to Def's SOF at ¶ 22-23; Def's App. Ex. 41.   The Termination Agreement was approved by the Bankruptcy Court on October 14, 2003.   Def's SOF at  ¶ 24; Lien Claimants' Resp. To Def's SOF at ¶ 24.   Pursuant to the Termination Agreement, Howe-Baker was required to pay Jones $500,000 as a termination fee.  Def's SOF at ¶ 24 n.2; Lien Claimant's SOF at  ¶ 34; Def's App. Ex. 41 at § 3.E.  In addition, Howe-Baker and Jones agreed that the portion of the total HB/Jones Subcontract that was actually completed by Jones was 30.05%.  Id. at ¶ 26; Def's App. Ex. 41 at §3.F.  Based on this percentage, the parties negotiated the value of the HB/Jones subcontract to be $12,448, 270[2].  Id. at ¶ 33; Def's App. Ex. 31 at § 3.F.  Moreover, at the time of the Jones Bankruptcy, Howe-Baker had already paid Jones $8,485,303.07 for its work on the Project.  Id. at ¶ 37; id. at ¶ 37.   In addition to Howe-Baker's obligations to Jones, the Termination Agreement required Howe-Baker to pay Marino $1,540,488 pursuant to its lien claim and to pay Amquip $484,278.24 for the work it had performed under its subcontract with Jones.  Id. at ¶  34; Lien Claimants' Resp. to Def's SOF at ¶ 34.  Howe-Baker made the payments on October 10, 2005 prior to Valero's receipt of any lien claims filed by Lien Claimants.  Id. at ¶ 36; id. at ¶ 36.

---

[2]Pursuant to the Termination Agreement, 30.05% of $41,425,192 (the value of the entire Jones Subcontract) is $12,448,270, the agreed upon value of the of the work that Jones completed.

4

Moreover, after Howe-Baker had received notice of a lien claim filed by one of the Lien Claimants in this action, Howe-Baker settled the claims of several non-Lien Claimant subcontractors.  Def's SOF at ¶ 48.  Specifically, Howe-Baker settled Advanced Specialty's claim for $357,878.80, Kraemer's claim for $508,995.23, and Pico's claim for $68,389.16.  Id. at 46; id. at 46.

Despite Howe-Baker's various payments and settlements, many of Jones' subcontractors and suppliers, including Lien Claimants, were not fully compensated for their work.  Id. at ¶ 43; id. at ¶ 43.  Between October 7, 2003 and October 31, 2003, each of the Lien Claimants individually filed lien claims against Valero/Howe-Baker.  Id. at ¶ 46; Lien Claimants' SOF at ¶ 37. The liens were served on Valero/Howe-Baker from October 10, 2003 through November 4, 2003.  Lien Claimant's SOF at ¶ 37.  The combined amount of Plaintiffs' lien claims is $9,796,424.88[3].  Defendants' SOF at ¶ 46,50; Lien Claimants' Resp. to Def's SOF at ¶ 46,50.

On October 27, 2003, Howe-Baker submitted an invoice to Valero for $3,110,239; up until that date, Howe-Baker's cumulative invoices had totaled $93,127,239 including $9,312,728 as retainage.  Lien Claimant's Ex. 5 at 2.  Of that total amount, $22,967,555 was for construction services. Id.; Def's App. Ex. 36 at 2.

 Between November 12, 2003 and March 30, 2004, each of the Lien Claimants

---

[3]Specifically, on October 7, 2003, Riggs filed a lien claim for $771,407; on October 8, 2003, Schoonover filed a lien claim for $310,947.66; on October 15, Merrell filed a lien claim for $149,557.57; on October 17, 2003, I&S filed a lien claim for $5,540,601.91; on October 23, Schwertner filed a lien claim for $1,734,531.04 and Mid-Atlantic filed a claim for $239,966.03; on October 24, 2003, Brennan filed a claim for $613,386.20; finally, on October 31, 2003, SM filed a lien claim for $454,979.07. Defendants' SOF at ¶ 46,50; Lien Claimants' Resp. to Def's SOF at ¶ 46,50.

individually filed a complaint in Superior Court of New Jersey, Gloucester Vicinage[4].  After the
actions were filed in Gloucester, they were removed by motion to the United States District Court
of New Jersey and consolidated by Court Order on June 17, 2004.  On January 21, 2004, Riggs
filed an amended Complaint against Valero and Howe-Baker.  On February 6, 2004, Valero and
Howe-Baker filed a third party complaint against the rest of the Lien Claimants.  On July 12,
2005, Defendants, Valero and Howe-Baker moved for Partial Summary Judgment on the
calculation of the amount of the Lien Fund alleging that the value of the fund is no less than
$1,769,291.26.  On July 13, 2005, Lien Claimants also moved for Partial Summary Judgment
alleging that the amount of the lien fund is no more than $9,796,424.79.

## II. Discussion

### A. Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue as to any material fact
and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56 (c); Celotex
Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A genuine issue of material fact is one that will
permit a reasonable jury to return a verdict for the nonmoving party.  Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 248 (1986).  To show that a genuine issue of material fact exists, the
nonmoving party may not rest upon mere allegations, but must present actual evidence in support
thereof.  Id. at 249 (citing First Nat'l Bank of Arizona v. Cities Svc. Co., 391 U.S. 253, 290
(1968)).  In evaluating the evidence, the Court must view evidence and draw inferences "in the

---

[4]Riggs filed a complaint on November 12, 2003; Merrell filed on December 23, 2003;
Brennan, on January 20, 2004; Schwertner on February 10, 2004; Schoonover and S.M. Electric
on March 12, 2004; and I&S and Mid Atlantic on March 30, 2004.

light most favorable to the party opposing the motion." Waldorf v. Shuta, 896 F.2d 723, 728 (3d Cir. 1990) (quoting Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976)).

## B. New Jersey's Construction Lien Law

The instant dispute concerns the proper interpretation of New Jersey's CLL and specifically, the calculation of the Construction Lien Fund, the maximum lien liability of a property owner against whom a lien has been filed. N.J. Stat. Ann. §2A:44A1 et seq (West 2005).   The Lien Claimants move for Summary Judgment alleging that the Court may only consider the EPC Agreement between Valero and Howe-Baker, and the contracts between Jones and the Lien Claimants in its determination of the value of the Construction Lien Fund.   On that basis, Lien Claimants argue that the value of the fund should not be less than $9,796,424.79. Defendants, on the other hand, allege that the Court must consider all the contracts in the construction chain including the contract between Howe-Baker and Jones in determining the value of the lien fund.  According to Defendants, therefore, the fund is worth no more than $1,769,291.26.

Although the CLL has been discussed at some length by New Jersey courts, the calculation of the lien fund has been addressed infrequently, and the specific issue of the contracts that a court may or may not consider in determining the amount of the lien fund has only been discussed in a single unpublished opinion by the New Jersey Superior Court[5].  Enacted in 1994, the CLL "mak[es] it easier for contractors, subcontractors and suppliers to place

---

[5] Joseph A. Natoli Construction Corp. v. Lawrence Steel Construction Corp., No. L-476-96, Superior Court of New Jersey, Somerset County (Honorable Robert E. Guterl).

construction liens on property in the amount of the work, services or material they have provided, and for which they have not been paid." Thomas Group Inc., v. Wharton Senior Citizen Housing, Inc., 163 N.J. 507, 509 (2000).   In other words, the CLL protects a "contractor's right to file a lien claim for the value of work it has performed." Id.  The New Jersey Supreme Court has held that the primary purpose of the CLL is to "secure payment for contractors, subcontractors, and suppliers who furnish labor or materials used to enhance the value of the property of others." Craft v. Stevenson, 179 N.J. 56, 63 (2004).  This purpose is achieved by enabling contractors, subcontractors and suppliers/sub-subcontractors to file lien claims against the contracting owner's property thereby protecting the "value of the work and materials they have provided." Id. at 68.  Specifically, the CLL states, "[a]ny contractor, subcontractor or supplier who provides work, services, material or equipment pursuant to a contract shall be entitled to a lien for the value of the work or services performed, or materials or equipment furnished in accordance with the contract and based upon the contract price....[t]he lien shall attach to the interest of the owner in the real property." N.J. Stat. Ann. §2A:44A-3.  However, the CLL limits the size of a lien claim "to the contract price, or any unpaid portion thereof, whichever is less, of the claimant's contract for the work, services, material or equipment provided." N.J. Stat. Ann. §2A:44A-9.

Moreover, the New Jersey Supreme Court has held that an additional goal of the CLL is to protect property owners who have met their financial obligations from "the burden of double payment for work and materials." Craft, 179 N.J. at 68.  In light of this additional purpose, the CLL provides an upper limit for the calculation of a lien fund:

  [T]he maximum amount for which an owner will be liable. . . shall not be

greater than: (a) In the case of a <u>lien claim filed by a contractor</u>, the total amount of the contract price of the contract between the owner and the contractor less the amount of payments made....(b) In the case of a <u>lien claim filed by a subcontractor or supplier</u>, the amount provided in subsection (a) of this section, <u>or</u> the contract price of the contract between the contractor or subcontractor and the subcontractor or supplier, as applicable, pursuant to which the work, services or equipment is provided by the subcontractor or supplier, less the amount of payments made...prior to receipt of a copy of the lien claim. . . whichever is less.

N.J. Stat. Ann. §2A:44A-10 (emphasis added).

According to the plain language of the statute, the amount of the lien fund will never exceed the difference between the value of the entire prime contract between an owner and a general contractor and the amount the owner has paid to the contractor when the lien claim is filed.  <u>See</u> <u>Craft</u>, 179 N.J. at 69.  Therefore, the prime contract price is the starting point for determining the measure of the lien fund "because it is within the four corners of that contract that the contractor, the subcontractors, and suppliers provide services or materials to enhance the value of the owner's property. Likewise, the amount remaining unpaid on that contract is the measure of the fund." <u>Id.</u> at 77.  Thus, if a contractor has performed and the property owner has failed to pay, the entire contract price is the limit of the lien fund.  <u>Id.</u>  Similarly, if the owner has paid the contractor a portion of the contract price, the lien fund decreases by that amount and the owner is protected by the amount of payment.  <u>Id.</u>  Finally, if the contract costs are fully paid by the owner, there is no lien fund "against which to measure an unpaid lien claimant's entitlement because nothing is owed. . . the lien fund will never include what the owner has already legitimately paid." <u>Id.</u>

With this in mind, the Court's analysis of the calculation of the lien fund is guided by two competing policies that underlie the CLL.  First, a court must consider the importance that the

9

CLL places on seeing that subcontractors and suppliers are paid for their work; however, a court must also weigh the statute's protection of property owners and contractors in ensuring that no one in the construction chain will have to pay twice for the same work.  The instant conflict lies at the crossroads of these policies.  Specifically, the parties dispute (1) the total amount of the prime contract pursuant to N.J. Stat. Ann. §2A:44A-10(a); and (2) whether the Court must consider all of the contracts in a construction chain to determine the value of the lien fund including the contract between Howe-Baker and Jones, or if the Court may only consider the contracts between Valero and Howe-Baker and the contracts between Jones and each of the Lien Claimants.

1. N.J. Stat. Ann. §2A:44A-10(a): Contract between owner and contractor less payments made

      The Court will initially consider the calculation of the lien fund pursuant to N.J. Stat. Ann 10(a).  As noted above, in evaluating the starting amount of a construction lien fund, section 10 of the CLL requires a court to consider "the total amount of the contract price of the contract between the owner and the contractor less the amount of payments made."  N.J. Stat. Ann. §2A:44A-10(a). Accordingly, the Lien Claimants calculate the amount unpaid on the prime contract between Valero and Howe-Baker at the time the lien claim was filed.  The total amount of the EPC Agreement was at least $113,815,620.  Lien Claimant's Ex. 5 at 1.  Prior to October 27, 2003, Howe-Baker had invoiced $93,127,239 including $9,312,728 in retainage.  Id. at 2.  On October 27, 2003, Howe-Baker sent Valero an invoice for $3,110,239 including $311,024 in retainage.  Id.  Therefore, as of October 27, 2003, Howe-Baker's cumulative earnings were $96,237,478 and the amount that Valero had paid was $83,814,511.  Id.  Thus, according to Lien

10

Claimants, the amount remaining on the contract – total contract price ($113,815,62) minus amount paid ($83,814,511) – would be $30,001,109.

However, Lien Claimants argue, alternatively, that even under the New Jersey Supreme Court's Craft analysis there would be $12,422,967 owing on the contract and available for the lien fund.  In Craft, the New Jersey Supreme Court refused to consider the total contract price in determining the amount of a lien fund, and instead, considered the total amount due at the time the contractor left the job.  179 N.J. at 79-81.  There, the Court held that when a contractor had been paid to date and was not owed any additional money by the owner, there was no lien fund from which a sub-contractor or supplier could recover.  Id.  at 80.  The Craft court noted, "[T]he CLL remedy strikes a balance between the interests of owners, subcontractors and suppliers by securing payment *from the moneys owed by the owner to the contractor*. . ." Id. at 80.  In other words, in Craft, the New Jersey Supreme Court approved of an analysis that utilized the amount of money earned to date instead of the total contract value in determining the contract price for 10(a).  See id.  Thus, Lien Claimants argue that pursuant to the Craft analysis, this Court may consider the amount that Howe-Baker earned to date instead of the entire value of the EPC Agreement in determining the upper limit of the lien fund.  Under this analysis, the difference between Howe-Baker's cumulative amount earned to date – $96,237,478 – and the amount paid – $83,814,511 – would yield $12,422,967[6] for the lien fund, an amount greater than the Lien

---

[6]$12,422,967 is comprised of the gross amount due under the October 27, 2003 invoice ($3,110,239) plus the retainage withheld from previous invoices ($9,312,728). Although the Court finds that this amount is plainly less than the difference between the entire EPC Agreement and the amount Valero paid ($30,001,109), it is not necessary to rely on this amount because 10(b) requires the Court to consider other contracts – either the Howe-Baker/Jones Agreement and/or the Jones/Lien Claimants contracts – and one or both of these contracts are less than the amount in 10(a).

Claimants' total unpaid subcontracts with Jones.  Because the value of the lien fund is limited to the lesser of the values in 10(a) or 10(b), the Lien Claimants contend that the lien fund should be no less than $9,796,424,79, the value of the Lien Claimants' sub-contracts with Jones, the relevant contract in section 10(b)[7].

Although Defendants agree that the amount remaining unpaid on the prime contract is relevant for the calculation of the lien fund, they calculate this number differently than the Lien Claimants.  Unlike the Lien Claimants who look to the value of the entire contract, Defendants contend that the Lien Fund is limited to the amount unpaid on the Construction portion of the EPC Agreement, specifically the amount Valero owed to Howe-Baker for construction work at the time the Lien was received.   Defendants argue that prior to the lien claim being filed, Howe-Baker had submitted $22,967,556 in invoices to Valero for construction work and that Valero had paid this invoice in full except for 10% retainage or $2,296,755.  Thus, according to Defendants, the starting place for determining the maximum amount of the lien fund is the $2,296,755 retainage from the construction milestones.  The Court does not agree.

Defendants do not cite any case law for the proposition that this Court should focus solely on the construction portion of the contract and ignore the rest of the EPC Agreement between Howe-Baker and Valero.  According to the plain language of the statute, a Court must consider the "total amount of the contract price of the contract between the owner and the contractor less the payments made."  N.J. Stat. Ann. §2A:44A-10.  Moreover, in Craft, the New Jersey Supreme Court held that a lien fund is limited to the amount that an owner owes a contractor because this would allow "a lien encumbrance only to the extent that the owner is indebted to the contractor

---

[7]See discussion infra pp. 13-18.

and provides the owner with the right to use that money to pay the unpaid subcontractors and suppliers directly...in any case in which no money is owed by an owner to a contractor, no lien fund exists." 179 N.J. at 80. Neither <u>Craft</u> nor any other case law limits this amount to only that portion of the contract under which the subcontractors provided services. Additionally, the <u>Craft</u> Court found that a contractor has a duty to an owner to apply an owner's payments to the subcontractors working on the owner's specific project. <u>Id.</u> at 76. In <u>Craft</u>, the court held that because the contractor failed to specify to the subcontractor the project for which the payment should be earmarked, the contractor violated its duty to the owner. Unlike <u>Craft</u>, however, in the instant matter, there is only one Project – the construction of the refinery. All of the Jones Subcontractors were working on this project, thus, all the payments would be earmarked for that project.

Moreover, although Howe-Baker's invoices to Valero were divided into distinct categories for construction, fabrication, procurement and engineering, the invoices themselves were general invoices that requested one total payment for milestones completed up until a specified date. Lien Claimant's Ex. 6. In other words, Howe-Baker did not submit separate invoices to Valero based on the above four categories, and instead, submitted a single general invoice for all the categories. In addition, although Howe-Baker's invoices were divided into categories, the record is unclear as to whether Valero's payments were general payments based on the milestones or if the payments comprised specific payments for each distinct category of the Project. Similarly, although Howe-Baker's invoices specified the amount of retainage withheld in each of the four categories – construction, fabrication, procurement and engineering – the record is not clear as to whether Valero maintained distinct accounts for these withholdings

13

or if Valero kept these amounts in a single general retainage account.  Therefore, for these reasons, and in accordance with the Craft decision, for the purposes of §2A:44A-10(a), this Court will use the difference between the total amount Howe-Baker had invoiced when Jones walked off the job – $96,237,478 – and the amount that Valero had paid Howe-Baker –  $83,814,511 – to determine the total unpaid contract price, i.e. $12,422,967.

## 2. N.J. Stat. Ann. §2A:44A-10(b): Contracts in the Construction Chain

Next, Lien Claimants argue that the only other relevant contracts under section 10(b) are the unpaid subcontracts between Jones and the Lien Claimants.  Lien Claimants contend that according to the plain language of the statute, the Court may only consider two contracts in determining the amount of the lien fund: (1) the unpaid amount of the prime contract between Valero and Howe-Baker at the time these lien claims were filed; and (2) the total unpaid subcontract prices of the lien claimants.  N.J. Stat. Ann. §2A:44A-10(b).  The Lien Claimants rely on the language in Section 10(b) that directs the Court to review the contract price of a sub-subcontractor or supplier "as applicable, pursuant to which the work, services, materials or equipment is provided."  Id. at 10(b).  Because the only contracts under which the Lien Claimants provided services were the subcontracts between themselves and Jones, the Lien Claimants argue that these are the applicable and relevant contracts.  Accordingly, Plaintiffs argue that the amount of the lien fund equals the amount owed to the lien claimants, which is $9,796,424.79.  Because this amount is plainly less than the amount from Section 10(a), the Lien Claimants argue that the lien fund is not less than $9,796,424.79.

However, Defendants urge the Court to consider a third contract in determining the

14

amount of the lien fund.   Defendants argue that the CLL strikes a balance between the interests

of contractors, subcontractors and sub-subcontractors in being paid for services provided and an

owner's interest in only paying once for the same work. The CLL accomplishes this balance by

limiting the recovery of lien claims to the amount of the lien fund which is the smallest amount

unpaid in the construction chain.  Defendants contend that the Court must consider the contract

between Howe-Baker and Jones in determining the lien fund because the amount unpaid on the

HB/Jones Subcontract is the smallest amount unpaid in the construction chain.

To support their argument, Defendants rely on the unpublished <u>Natoli</u> decision[8] and

examples from the New Jersey Construction Lien Law Guide[9].  41 N.J. Prac.§12.58,

Construction Law.   In <u>Natoli</u>[10], the court considered the unpaid subcontract price between the

general contractor and its subcontractor in calculating the amount of the lien fund owed to a sub-

subcontractor under the CLL.  No. L-476-96, Superior Court of New Jersey, Somerset County.

Despite the fact that the subcontractor had not paid the sub-subcontractor, the Court held that

because the general contractor had paid the subcontractor in full, there was no lien fund to satisfy

the sub-subcontractor.  <u>Id.</u>  In other words, according to Defendants, <u>Natoli</u> stands for the

proposition that every contract in a construction chain must be considered when determining the

amount of a lien fund, and the maximum available fund for sub-subcontractors is the smallest

---

[8]<u>See</u> n. 5 <u>supra</u>.

[9]Although Lien Claimants challenge the Defendants' use of and reliance on this N.J.
Practice Guide, the Court notes that in <u>Craft</u>, the New Jersey Supreme Court cited a similar
treatise by the same author with approval. 179 N.J. at 71.

[10]It is important to note that because <u>Natoli</u> was an unpublished decision, written for the
benefit of the parties involved, the court's analysis of the facts and statute are not explicated and
there is no indication of the arguments that were put forth by either party in the case.

amount unpaid to any party in the construction chain.  Id.

Moreover, according to examples from the Construction Lien Law Guide, when an owner owes a contractor nothing, the subcontractor and supplier's lien funds are zero because the owner has paid the contractor for all its work and all payments made by the owner to the contractor reduce the lien fund available to the contractor and those claiming through the contractor.  41 N.J. Prac. §12.58.  The following chart depicts this application of the CLL. Id.

| | |
|---|---|
| Owner owes Contractor | $0 |
| Contractor owes Subcontractor | $10,000 |
| Subcontractor owes Sub-subcontractor | $5,000 |
| Sub-subcontractor's lien fund | $0 |

Similarly, when a contractor owes a subcontractor less than a subcontractor owes a sub-subcontractor, the starting point of the lien fund is limited to the lowest amount in the construction chain. In the following example, all payments made by the contractor to a subcontractor reduce the lien fund available to the subcontractor and those claiming under or through that subcontractor.  Id.

| | |
|---|---|
| Owner owes Contractor | $30,000 |
| Contractor owes Subcontractor | $25,000 |
| Subcontractor owes Sub-subcontractor | $40,000 |
| Sub-subcontractor's lien fund | $25,000 |

Defendants contend that the above example applies in the instant dispute.  Because Lien Claimants are sub-subcontractors or third-tier claimants, their recovery under the lien fund cannot be more than the amount that remains unpaid to the subcontractor with whom it contracted.  In other words, the lien fund is limited to the smallest amount unpaid in the construction chain.  Accordingly, Defendants argue that regardless of the amount remaining on

16

the contract between Valero and Howe-Baker at the time the lien claims were filed, because the

unpaid amount of the HB/Jones Subcontract is much smaller than either the prime contract or the

Lien Claimants sub-contracts, the maximum available lien fund would be the amount of the

HB/Jones Subcontract.  The following chart depicts Defendants' application of this example to

the instant dispute, using the Court's number for the prime contract[11].

| | |
|---|---|
| Valero owes Howe-Baker | $12,422,967 |
| Howe-Baker owes Jones | $3,962,966.93[12] |
| Jones owes Lien Claimants | $9,796,424,79 |
| Lien Claimants Lien Fund | $3,962,966.93 |

To more fully articulate its position, Defendants offer additional hypothetical examples to

show the anomalous outcomes that would result if this Court interpreted the CLL otherwise.

Specifically, Defendants suggest that if Jones had not hired sub-subcontractors to perform the

Jones Subcontract, and had performed the work itself, the lien fund would be limited to the lesser

of the unpaid contract between Valero and Howe-Baker and the unpaid price of the subcontract

between Howe-Baker and Jones.  Therefore, defendants argue, the result should not change

simply because Jones hired sub-subcontractors to perform the work under the HB/Jones

Subcontract; according to Defendants, such a result would be anomalous because a property

owner's risk would increase significantly merely because a subcontractor hired sub-

subcontractors and suppliers to perform the work instead of performing the work itself.

---

[11]See n.6 supra.

[12]According to Defendants' figures, the amount that Howe-Baker owes Jones is the
difference between the amount agreed upon in the Termination Agreement and the amount that
Howe-Baker had paid Jones prior to its bankruptcy. The Court is not endorsing Defendants'
reliance on these numbers, but is merely using Defendants' numbers by way of example.  For a
discussion of the Court's rejection of these numbers, see discussion infra pp. 19-20.

The Court agrees with Defendant's analysis of the construction chain.  Specifically, the Court agrees that it must consider all of the contracts in the construction chain including the HB/Jones subcontract to properly determine the value of the lien fund.  The New Jersey Supreme Court has held that when an owner or contractor is making payments to subcontractors further down the construction chain, it should not be subjected to double payments when a sub-contractor fails to pass the payments further down the construction chain.  See Craft, 179 N.J. at 79-80.  In Craft, the New Jersey Supreme Court protected a property owner against double payment when the owner had paid a contractor in full for the value of the contractor's services. There, the court held that despite the contractor's failure to pass along the payments to its subcontractor, the owner was protected by his payments to the contractor.  See id.  In Craft, the Court relied on the competing policies of the CLL to hold that "the lien fund can only be based on what is actually owed"; where the owner pays the contractor in full for services provided, there is no lien fund from which a subcontractor may recover.  Id. at 80.

Similarly, in this dispute, I will consider all of the contracts in the construction chain and look to the smallest amount unpaid as the amount of the lien fund.  As in Craft, where the owner had paid the contractor in full for its services prior to termination, here, Valero had paid a substantial sum to Howe-Baker, who, in turn, had paid Jones for a significant portion of its services prior to Jones' Bankruptcy.  Thus, the Defendants must be protected for their legitimate payments to Jones despite Jones' failure to pass these payments along to Lien Claimants. Furthermore, the underlying policy of the CLL requires a court to protect both the interests of subcontractors in getting paid and the interests of the owner in paying only once for the same work.  This policy can only be fulfilled if the Court considers the entire construction chain and

18

gives credit to all payments that were earned and due whether or not these payments were subsequently forwarded down the chain.  If the Court held otherwise, Defendants would be penalized by being subject to paying twice for the same work.

Moreover, the Court notes that the CLL is not the exclusive remedy for an unpaid contractor or supplier.  Craft, 179 N.J. at 76.   The CLL explains that "nothing in [the CLL] shall be construed to limit the right of any claimant from pursuing any other remedy provided by law." N.J. Stat. Ann. 2A:44A-3.  An unpaid subcontractor or supplier "can exercise other means to recoup payments" for services or supplies it provided to a contractor including bringing suit against the subcontractor, general contractor and owner "for the benefit of whose property" it provided services. Craft, 179 N.J. at 77.  Indeed, Lien Claimants have pursued additional remedies; for example, six of the eight Lien Claimants filed claims against Jones in the bankruptcy proceedings[13].  Def's SOF at ¶ 44; Lien Claimants' Resp. to Def's SOF at ¶ 44.  In addition, Lien Claimants have filed common law claims against Defendants including a quantum meruit claim for the reasonable value of labor and materials.  See e.g. Riggs Compl. at 6-7.

However, while the Court agrees with Defendants that it must consider all the contracts in the construction chain, the Court does not agree with Defendants' calculation of the lien fund. Specifically, this Court rejects Defendants' use of the Termination Agreement value from the HB/Jones Subcontract as a starting point for a determination of the value of the lien fund.  The Termination Agreement reflects a settlement between Howe-Baker and Jones in which these two parties negotiated a value for the Jones Subcontract in order to settle their own dispute.  Def's

---

[13]The Lien Claimants who also filed in the bankruptcy proceedings include: Brennan, Merrell, Riggs, Schoonover, I&S and Mid-Atlantic.

App. Ex. 42.  Although the value of the settlement amount relied, in part, on Jones' weekly construction reports, Def's SOF at ¶ 17, this amount is not binding upon the Lien Claimants. Lien Claimant's Ex. 18 at 6.  Further, while the Bankruptcy court approved the Termination Agreement, the court specifically held that "nothing in this Order or in the Plan shall constitute a determination that the Valero Subs are bound by any representations in the Valero Settlement identifying the final Jones Subcontract amount or the percentage of work in place at the time of the Jones termination."  Id.  Moreover, because the value of the Termination Agreement was negotiated by Howe-Baker and Jones, it may not reflect the actual construction services that were performed under the Jones Subcontract and may not account for the work that was actually performed by the Lien Claimants.  For these reasons, although the Court holds that the HB/Jones Subcontract must be considered as part of the construction chain, questions of fact exist as to the actual value of the HB/Jones subcontract that preclude summary judgment on fixing the value of the lien fund.

3. Payments by which Howe-Baker can reduce amount of lien fund.

Finally, the Court will consider whether Howe-Baker's payments to other non Lien-Claimant subcontracts may reduce the amount of the lien fund.  Defendants argue that the lien fund must be reduced by all payments it made to any of the Jones Subcontractors prior to receipt of lien claims by any one of the Lien Claimants.  Specifically, Defendants contend that the lien fund must be reduced by its payments to Amquip and Marino pursuant to the Termination Agreement and by Howe-Baker's settlement with Advanced Specialty, Kraemer and Pico.  Lien Claimants, on the other hand, contend that material facts exist regarding the propriety and

amount of Howe-Baker's payments to non-Lien Claimant subcontractors that preclude summary judgment on this issue.

To begin, it is essential to note that the lien fund accrues from the date of the filing of the relevant lien claim, not on the date that any lien claim is filed.  See Triple "R" Enterprises Inc., v. Pezotti, 344 N.J. Super. 31, 38 (App. Div. 2001).  In this case, the parties do not dispute that Lien Claimants filed their lien claims beginning October 7, 2003 through October 31, 2003.  Lien Claimant's SOF at ¶ 37; Def's SOF at ¶ 46 (a)-(m).  Therefore, the date on which the lien fund began to accrue is October 7, 2003.

Moreover, according to the plain language of the statute itself, a lien fund will be reduced by "the amount of payments made. . . prior to the receipt of the lien claim. . . to the contractor or supplier or any other claimant who has filed a lien claim or a Notice of Unpaid Balance and Right to File Lien pursuant to a contract with such subcontractor or supplier."  N.J. Stat.Ann. § 2A:44A-10(b) (emphasis added).  The Defendants did not receive notice from any of these lien claimants until October 10, 2003, the date that Schoonover's lien claim was served on Valero. Def's SOF at ¶ 36; Lien Claimant's Resp. to Def's SOF at ¶ 36; Lien Claimant's SOF at ¶ 37. Therefore, according to the statute, the Defendants may be able to reduce the lien fund by payments made prior to October 10, 2003.  Thus, although the contract price is the starting point from which a court calculates the amount of a lien fund, a property owner will get credit for legitimate payments made to a contractor.  See AEG Holdings LLC v. Tri-Gem's Builders, Inc. 347 N.J. Super. 511, 514 (N.J. Sup. Ct. App. Div. 2002); Legge Industries v. Joseph Kushner Hebrew Academy, 333 N.J. Super. 537, 547 (N.J. Sup. Ct. App. Div. 2000).  However, "[not] every payment to a contractor will concomitantly reduce the size of a property owner's lien

fund." Craft, 179 N.J. at 69.  For example, the Craft Court noted that "there is no evidence that

the Legislature intended to permit a property owner to defeat a supplier's lien claim by

knowingly or negligently advancing payments to the contractor that are not due." Id. at 70.

Therefore, the only payments that are able to reduce a lien fund are payments made "in

accordance with the written contract and commensurate with the performed work. . .all other

payments must be recaptured in. . . the lien fund." Id. Thus, a lien fund will not be reduced by

payments that "were not earned or due before the subcontractor's lien was filed." AEG

Holdings, 347 N.J. Super. at 547.

Moreover, New Jersey courts have held that certain additional payments will not reduce

the total value of a lien fund including "payments in violation of contract provisions or other

collusive payments and retainages, even when an owner is required to spend further money to

complete construction." Legge Industries, 333 N.J. Super. at 557.  In Legge, the court held that

an owner's use of retainage to make post-lien filing payments to a successor contractor would not

reduce the lien fund and that the lien fund included the amount of money withheld as contractual

retainage whether or not the general contractor remained on the job.  Id. at 558.

Initially, Defendants contend that the maximum lien fund must be reduced by its

payments to Marino and Amquip.  Defendants argue that Marino, one of Jones subcontractors,

filed a construction lien claim on October 2, 2003 for $1,608,109 and that Defendants paid

Marino $1,540,488 on October 10, 2003, prior to being served by Lien Claimants.  Similarly,

Defendants argue that Amquip, another non-Lien Claimant subcontractor, notified Howe-Baker

of its intent to file a construction lien for $484,274 against the project and that Howe-Baker paid

Amquip at the same time it paid the Marino lien claim.

The Court, however, finds that there are significant issues of material fact that preclude summary judgment on the amount that Howe-Baker can deduct for its payments to Amquip and Marino.  Although the parties do not dispute that Marino had properly filed a lien claim prior to the Defendants' notice of Plaintiffs' lien claims, the Lien Claimants dispute the amount of the Marino payment.  Specifically, Plaintiffs argue that the amount includes a $468,035.78 change order that was never approved for Jones and that the Jones' subcontract amount was not increased to reflect the value of the additional work.  This dispute raises a significant issue of material fact that cannot be decided on this motion for summary judgment.

Similarly, although the parties agree that Amquip did not file a lien claim prior to Plaintiffs' lien claims, the record is unclear as to what, if anything, Amquip did file and whether Amquip may have filed an official "Notice of Unpaid Balance and Right to File Lien" pursuant to N.J. Stat.Ann. § 2A:44A-10(b) or if it merely notified Defendants of its intent to file a lien claim. Therefore, summary judgment is not ripe on the issue of the amount by which Howe-Baker can reduce the maximum lien fund for its payments to Amquip and Marino.

However, Defendants additionally contend that the maximum lien fund must be reduced by its settlements with Advanced Specialty, Kraemer and Pico[14] pursuant to Section 23 of the CLL which establishes that "[a]ll lien claims established by judgment shall be concurrent and shall be paid pro rata out of the lien fund and the proceeds of the sale authorized by this act." Defendants argue that Section 23 puts all parties filing liens on the same footing regardless of the time that the individual lien claims were filed. Thus, under Section 23 all claims by

---

[14]Defendants settled Advanced Specialty's Lien Claim for $357, 878.80, Kraemer's Lien Claim for $508,995.23 and Pico's Lien claim for $68,389.16.

23

subcontractors are deemed to be concurrent and the court must determine the pro rata share of each of the claims to which each Lien Claimant is entitled. According to Defendants, the pro rata percentage is measured by dividing the maximum available lien fund by the total value of the liens asserted by Lien Claimants and the Settling Claimants. Because this Court rejects Defendants' calculation of the maximum amount of the lien fund[15], at this juncture, the Court cannot determine the pro rata share for any of the settled lien claims. Therefore, material issues of fact remain as to what, if any, deductions Howe-Baker may take for its settlement with Advanced Specialty, Kraemer and Pico.

## III. CONCLUSION

For the reasons discussed herein, Lien Claimants' Motion for Partial Summary Judgment is DENIED and Defendants' Motion for Partial Summary Judgment is DENIED. An appropriate order will follow.

Dated: October 31, 2005                           /s/ Freda L. Wolfson
                                                   Honorable Freda L. Wolfson
                                                   United States District Judge

---

[15]See discussion supra at 19. This Court merely accepts Defendants' analysis as far as it requires the Court to consider all the contracts in the Construction Chain; however, we reject the Defendants' reliance on the value of the Jones Subcontract as agreed upon in the Termination Agreement.

24